UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  14 CR 557-1 |
| | ) | Hon. Virginia M. Kendall |
| CHARLISE D. WILLIAMS | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUTTAL OR, IN THE ALTERNATIVE, A NEW TRIAL**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States

Attorney for the Northern District of Illinois, respectfully requests that this Court deny the

motion of defendant Charlise D. Willams for judgment of acquittal pursuant to Federal

Rule of Criminal Procedure 29 or, in the alternative, a new trial pursuant to Federal Rule

of Criminal Procedure 33.  On June 20, 2016, a jury unanimously found defendant guilty

of the five counts of bankruptcy fraud charged in the indictment.  The jury found that

defendant committed bankruptcy fraud in connection with both a case she personally had

filed in the Bankruptcy Court in October 2009 (Counts 1, 2, and 3), and a case she had

caused her codefendant, Ekkehard T. Wilke, to file in the Bankruptcy Court in February

2010 (Counts 4 and 5).

Defendant's motion pays lip service to the standards of a Rule 29 and Rule 33

motion, but it proceeds to disregard those standards.  Defendant fails to explain how no

rational jury could have found the elements of the offense proven beyond a reasonable

doubt.  She also contends that the Court erred in certain evidentiary rulings and in

instructing the jury.  However, the jury's verdict was reasonable and supported by

overwhelming evidence, and the Court's evidentiary rulings and jury instructions were correct.  Defendant's motion should be denied.

## I.    LEGAL STANDARDS

Federal Rule of Criminal Procedure 29 provides that a judgment of acquittal should be entered only if "the evidence is insufficient to sustain a conviction."  Courts give "heavy deference" to a jury's verdict, and it is therefore "exceedingly difficult" for a defendant to prevail on a Rule 29 motion for acquittal.  *United States v. Caldwell*, 423 F.3d 754, 759 (7th Cir. 2005); *United States v. Emerson*, 501 F.3d 804, 811 (7th Cir. 2007) (defendant mounting challenge to sufficiency of the evidence faces an "uphill battle").  In evaluating a Rule 29 motion, the Court should ask whether the evidence presented, when viewed in the light most favorable to the government, could support any rational trier of fact's finding of all the essential elements of the crime beyond a reasonable doubt.  *United States v. Brown*, 328 F.3d 352, 355 (7th Cir. 2003).

Proving that no such evidence exists poses "a nearly insurmountable burden" for the defendant because the Court's role is not to reweigh evidence or make credibility determinations; that is the jury's province alone.  *Brown*, 328 F.3d at 355.  "The verdict [is] the jury's to reach." *United States v. Cunningham*, 108 F.3d 120, 121 (7th Cir. 1997).  It is up to the jury, exclusively, and not the Court on a Rule 29 motion, to resolve conflicts in the evidence and to draw reasonable inferences from the evidence.  *Id.*

It is equally difficult for a defendant to obtain relief under Federal Rule of Criminal Procedure 33.  Rule 33 provides in pertinent part that "the court may vacate any judgment

2

and grant a new trial if the interest of justice so requires." Rule 33 motions are disfavored, and are granted sparingly. *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989). In part, this is because of the interest in finality. *United States v. Kamel*, 965 F.2d 484, 490 (7th Cir. 1992).

In evaluating a Rule 33 motion, the Court may not reweigh the evidence or set aside the verdict simply because it feels some other result would be more reasonable. *Reed*, 875 F.2d at 113. Conflicting testimony or questions concerning a witness's credibility are generally insufficient grounds for granting a new trial. *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (witness credibility issues can prompt a new trial only in exceptional circumstances, such as "where the testimony contradicts physical facts or laws"). In sum, for a new trial to be granted, the Court must find that the trial was infected by extraordinary circumstances, rendering the jury's verdict unjust: "[t]he evidence must preponderate heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand before a motion for a new trial may be granted." *Reed*, 875 F.2d at 113.

In her motion, defendant makes three arguments. First, she argues that the evidence was not sufficient to convict her beyond a reasonable doubt of bankruptcy fraud. Second, defendant objects to some of the Court's evidentiary rulings during the cross-examination of three government witnesses. Third, defendant argues that the Court erred relating to two jury instructions, an aider or abettor instruction and a good faith instruction. Her motion should be denied.

3

## II.     ARGUMENT

### A.     The Evidence Was Sufficient to Convict Williams of Bankruptcy Fraud

The evidence was sufficient for the jury to convict defendant of bankruptcy fraud. Defendant utterly fails to explain any inadequacies in the evidence; she simply asserts that the evidence was insufficient both as a matter of law and as a matter of fact, as well as to establish her intent to defraud. Motion at 2. To the contrary, the evidence overwhelmingly showed her guilt in each respect.

To sustain a conviction for bankruptcy fraud, the government must show beyond a reasonable doubt that: (1) the defendant knowingly devised or participated in a scheme to defraud; (2) the defendant did so with the intent to defraud; (3) the scheme to defraud involved a materially false or fraudulent representation, claim, or promise; and (4) for the purpose of executing or concealing the scheme, the defendant filed a petition or other document in a proceeding under title 11. *See* 18 U.S.C. § 157(1) and (2); *United States v. Holstein*, 618 F.3d 610, 611-12 (7th Cir. 2010) (setting out elements of bankruptcy fraud pursuant to 18 U.S.C. § 157(1)).

Summarized briefly, the evidence at trial showed that defendant filed a series of five Chapter 13 bankruptcy cases in her own name between 2003 and 2009. Defendant did not make many, if any, repayment plan payments in these five cases; four of these cases were dismissed by the Bankruptcy Court because of her failure to comply with the Chapter 13 payment plans, and defendant herself dismissed one of the cases (just before she engaged in sham transfers of the title to her condominium units to Wilke and then back to her, so

4

that she could obtain a larger mortgage on the condo units using Wilke's name and credit). The bankruptcy petitions and Chapter 13 plans filed by defendant contained multiple false statements. The evidence showed clearly that defendant had not filed these five bankruptcy cases in good faith attempts to reorganize her finances and repay her creditors, but rather were ploys to abuse the bankruptcy laws and obtain the benefits of the automatic stay provision, which prevented creditors such as her mortgage holders and her condo association from collecting the money defendant owed to them and from pursuing their legal remedies for her numerous failures to pay the ever-increasing amounts of the debts defendant was accruing. Indeed, defendant's later bankruptcy cases were each filed directly after a collection action was initiated or resumed by a creditor.

When the Bankruptcy Court dismissed her fifth Chapter 13 case in December 2009, the Court also barred defendant from filing another bankruptcy case for 180 days. To circumvent this legal bar, defendant engaged in a second set of fraudulent transfers of the title to her condominium units, once more to Wilke and then back to her, causing only the deed transferring title to the condo units to Wilke to be recorded and made a matter of public record. Defendant then further convinced Wilke to file a Chapter 13 bankruptcy petition in his own name in early 2010, falsely claiming that he owned defendant's condo units, for the purpose of preventing the condo association from obtaining an order of eviction and a money judgment against her. Shortly before this last-ditch effort to misuse the bankruptcy system collapsed on defendant, she testified falsely under oath before a Bankruptcy Judge regarding her ownership of the condominium units. The fact that

defendant was orchestrating this entire scheme to defraud was shown not only by the trial testimony of Wilke, Wilke's bankruptcy attorney (Michael Gunderson) and others, but also by the numerous Bankruptcy Court documents, the two sets of deeds that simultaneously flip-flopped ownership of the condo units between defendant and Wilke, and the dozens of emails that defendant had sent to Wilke, Gunderson, and others, directing them as to how to proceed in the bankruptcy case that was nominally in Wilke's name but was essentially defendant's sixth bankruptcy case.

Defendant's actions over the years and her own words in these emails made abundantly clear her intent to defraud and to abuse the bankruptcy system. Her assertion that the evidence at trial was insufficient to support her conviction is without merit.

### B. The Court Did Not Improperly Limit the Cross-Examination of Certain Government Witnesses

Defendant claims that the Court's evidentiary rulings during the testimony of three government witnesses deprived her of the opportunity to mount a full defense. Of course, trial courts have wide discretion in managing cross-examination and in ruling upon the admission of evidence. *E.g.*, *United States v. Hall*, 165 F.3d 1095, 1117 (7th Cir. 1999). The Court's rulings were correct for the reasons discussed below.

### i. Witnesses Carollyn Patterson and David Sugar

First, defendant claims that the Court "erred in preventing any cross-examination on certain issues relating to the bias and credibility of key witnesses" Carrolyn Patterson and David Sugar. Motion at 3. In support of this claim, defendant cites language in a

Seventh Circuit opinion, *United States v. Sasson*, 62 F.3d 874, 883 (7th Cir. 1995), and a Supreme Court opinion, *United States v. Abel*, 469 U.S. 45 (1984). Defendant's reliance on these cases is misplaced. In *Abel*, the Supreme Court stated that "[p]roof of bias is almost always relevant," 469 U.S. at 52, but it never said that a defendant has an unlimited opportunity to ask any questions that might possibly reveal any type of bias on the part of a witness. The Court actually noted that its prior holdings had established that "the Confrontation Clause of the Sixth Amendment requires a defendant to have *some* opportunity to show bias on the part of a prosecution witness." *Id.* at 50, citing *Davis v. Alaska*, 415 U.S. 308 (1974) (emphasis supplied). Multiple Seventh Circuit and other appellate decisions echo this, holding that "the trial court has wide discretion in limiting the boundaries of proper and improper cross-examinations." *Sasson*, 62 F.3d at 882.

Indeed, defendant's motion cites a portion in *Sasson* which in effect says that when a defense is *completely* foreclosed from exposing a witness's bias or motive to testify, that limitation may directly implicate the defendant's Sixth Amendment rights. Motion at 4. Defendant fails to note that the *Sasson* court went on to describe a Supreme Court case, *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), in which the trial court had prohibited *all* inquiry into the possibility that a witness would be biased because the state had dismissed a pending criminal charge against him. Moreover, in both *Van Arsdall* and *Sasson*, the courts ultimately found that even if there had been a Sixth Amendment violation, the defendants' convictions should be affirmed because any error was harmless, given the

7

overall strength of the prosecution's cases. *Van Arsdall*, 475 U.S. at 684; *Sasson*, 62 F.3d at 885.

In this case, defendant was not completely foreclosed from showing any witness's possible bias. Defendant complains in particular about the limitation on questions in cross-examination about a lawsuit she had brought against the condo association. Motion at 4. Contrary to defendant's assertion, this was not a "specific issue[] . . . put into dispute by the government on direct examination." *Id.* With respect to witness Carrolyn Patterson, the government asked no question about the lawsuit on direct examination; the defense first asked about it on cross-examination. Tr. 6/15/16 at 371. After the government objected to a series of defense counsel's questions about the lawsuit, *id.*, the Court held a long sidebar. In this discussion, the Court correctly found that, given that defendant had never contested the validity of the condo association's assessments in her multiple bankruptcy cases, her trying to raise this possible issue in her criminal case was in effect an improper attempt at jury nullification. *Id.* at 372-73, 374-75, 376-77, 380-81. Consistent with the authorities cited above, the Court noted the limitations on proper cross-examination, stating that "bias is appropriate, but bias has to be her motivation for testifying against your client." *Id.* at 381.

With respect to David Sugar, the government again asked no questions on direct examination about the lawsuit defendant had brought against the condo association. Before cross-examination began, defense counsel again raised the subject of that lawsuit with the Court. Although the Court gave the defense multiple opportunities to explain how the

8

lawsuit (a class action suit that defendant had joined) related to either a defense theory or to a bias or prejudice of Mr. Sugar (Tr. 6/17/16 at 842, 843-44, 848), defense counsel failed to articulate any basis for finding the class action to be relevant to the bankruptcy charges in this criminal case. The Court thus found that "Nothing about the substance of the suit is relevant. Nothing. It's a completely collateral lawsuit, and it doesn't go to prove or disprove any element of the crime here." *Id.* at 848. The Court went on to make the statements quoted in defendant's motion: "And for that reason, getting into why she sued or what the suit was about and details about, you know, who joined the suit is completely irrelevant because it doesn't go to prove or disprove an element." *Id.*

Defense counsel did not disagree with this ruling, which still permitted limited cross-examination about possible bias because of the fact that Mr. Sugar had represented the party that defendant had sued, or because the attorney's fees assessed to defendant included fees relating to the defense of defendant's lawsuit. *Id.* at 848-49. In fact, defendant's principal attorney *agreed* with the Court's ruling, stating that "we don't intend, and I do not intend in argument, to even reference the class action." *Id.* at 849.

Given defendant's ultimate acquiescence with the Court's view at trial, she cannot be heard now to claim that the limitations placed on the cross-examination of witnesses Patterson and Sugar about the cross-examination were erroneous, much less Constitutional error. And as in the *Van Arsdall* and *Sasson* cases, even if this were to be considered somehow erroneous, given the overwhelming strength of the government's case, any error

would be harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684; *Sasson*, 62 F.3d at 885.

### ii. Witness Ekkehard Wilke

Second, defendant contends that the Court improperly limited the cross-examination into the credibility of Ekkehard Wilke. Although defendant characterizes this as an inquiry regarding Wilke's truthfulness with the government (Motion at 5), this actually related to the propriety of the defense's questioning Wilke about a 2012 investigation by the Riverside Police Department into the possibility that prostitution activity was taking place at Wilke's residence.

On cross-examination of Wilke, defense counsel asked Wilke numerous questions about his having paid money to multiple women. At sidebar, after the Court said "Let's see if we can try to see if there's relevance to this" (Tr. 6/16/16 at 625), counsel advised the Court that "[a]ll of these relationships are sexual. All of these women are sex workers. He has – pays tremendous amount [sic] of money to all of these sex workers." *Id.* Defense counsel then proceeded to assure the Court that "I'm not trying to draw out that aspect of it. I want to be clear about that." *Id.* After the Court noted that this subject was "highly prejudicial" (*id.* at 627), counsel again stated that "I have not and I do not intend to make a link between the sexuality and the payments." *Id.* at 628. A short time later in the sidebar, counsel assured the Court yet again that she was not going to go any further in saying that the payments were for sex. *Id.* at 631-32.

10

Later in Wilke's cross-examination, counsel began asking him questions about a neighbor of his who had made multiple complaints to Wilke and to the Riverside Police Department. *Id.* at 634. The government objected to the relevance of this line of questioning, and the Court conducted another sidebar. *Id.* At sidebar, defense counsel explained that the neighbor had complained about "the goings on in [Wilke's] apartment, including smoking cigarettes, drugs, *prostitution, which I'm not going to elicit . . . .*" *Id.* at 635 (emphasis supplied). After hearing from the parties on this subject, the Court noted that the theory of defense was "far-fetched" but permissible. *Id.* at 636. The Court then cautioned counsel: "So you can do it, but I will sustain hearsay objections, and I will be listening for any of the junk about prostitution . . . ." *Id.*

Following this sidebar, counsel asked Wilke several questions about the neighbor and her complaints (*id.* at 637-39) and then proceeded to move on to other topics. After several minutes, counsel resumed asking questions of Wilke about his neighbor who had complained to Wilke and to the police. *Id.* at 652. Soon after this, Wilke was asked if he had continuously failed to provide material information to the FBI during a series of interviews with the government, and Wilke replied that "[t]here was no information that I withheld that, in my mind, had direct connection with Chapter 13." *Id.* at 655.

A minute or two later, defense counsel asked Wilke the following question: "You failed to tell the government until December 1st, 2012, that you were actually investigated – I'm sorry, December 1st, 2015, that you were actually investigated in 2012 by the Riverside Police Department for running a prostitution ring; isn't that correct?" *Id.* at 656.

11

The government immediately objected to this question, and the Court interrupted the questioning for another sidebar.  *Id.*

The Court asked defense counsel "why am I hearing this when you just told me 15 minutes ago that none of this prostitution angle was going to be discussed to this jury?"  *Id.* Defense counsel responded "[t]hat was relating to whether or not he was paying those women for sex.  This has to do with a criminal investigation that was ongoing during the time he was speaking to the FBI, that he was aware that he was being investigated. . . .  I think that is entirely different."  *Id.* at 656-57.  In fact, defense counsel had more recently assured the Court that with respect to her questions about the complaints to the police about "the goings on in [Wilke's] apartment," counsel was *"not going to elicit"* questions about prostitution.  *Id.* at 635 (emphasis supplied).

As the Court noted, "an accusation of a prostitution ring is a 403 analysis, of course" (*id.* at 659-60); this was consistent with the Court's earlier statement that the subject of prostitution was "highly prejudicial."  *Id.* at 627.  Indeed, later in the sidebar, the Court repeatedly noted that this was a "highly prejudicial issue" or "very prejudicial allegation." *Id.* at 665, 666.  In light of this, the Court decided to instruct the jury not to consider the alleged running of a prostitution ring.  The Court explained to defense counsel that the subject was:

> not going to come in, in significant part because it's a sanction for you not raising it with me earlier *and because you have sufficient cross-examination regarding direct lies that he's already made and omissions, so it's not going to be more likely to give you an advantage by prohibiting that one area of cross.*

*Id.* at 666 (emphasis supplied). Before the jury returned, the Court clarified the wording of this ruling:

> I don't want the word "sanction" to be used. I'm not sanctioning your conduct in any professional way, more as a decision that says *because of it being prejudicial and harmful to the jury, I'm excluding it and I'm making you not get it in for that reason. . . . So let's make sure the record is clear about that. It's an evidentiary ruling that limits your ability to go there.*

*Id.* at 667 (emphasis supplied).

The Court's exclusion of this evidence was clearly correct under Rule 403 of the Federal Rules of Evidence. As the rule provides, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Any minimal probative value the fact of some investigation of alleged prostitution activity had was greatly outweighed by virtually every one of the factors outlined in Rule 403.

As a matter of fact, Wilke was *never* charged with, much less convicted of, any crime as a result of whatever prostitution investigation took place. *Id.* at 660. Moreover, there was no evidence whatsoever that Wilke had ever failed to be truthful with the FBI about this matter. *Id.* at 661, 681-83. As he testified on redirect examination, in every meeting with the government, Wilke answered every question put to him as completely and truthfully as he could. *Id.* at 682.

Defendant's claim that the Court erred in limiting "reverse 404(b) evidence" misses the mark; it really has nothing to do with this case. Although the Court referred more than

13

once to the failure of the defense – and of the government, as well – to raise the prostitution issue in advance of trial, the Court made it clear that the evidence was being excluded both because it was overly prejudicial within the meaning of Rule 403 (*id.* at 667) and because its incremental value was slight, given all the other lies and omissions by Wilke that the defense was permitted to elicit. *Id.* at 666.

Moreover, none of the cases cited by defendant at pages 6 and 7 of her motion is at all applicable to the facts of this case. Those cases deal with prior criminal acts of a witness, such as theft and forgery, *United States v. Sanders*, 708 F.3d 976 (7th Cir. 2013); bank robbery, *United States v. Seals*, 419 F.3d 600 (7th Cir. 2005); and aggravated sexual assault and battery, *United States v. Stevens*, 935 F.2d 1380 (3rd Cir. 1991). In each case, the question under the "reverse 404(b) evidence" doctrine was whether the prior crimes of another person were similar enough to the crimes with which the defendant was charged to exonerate the defendant. *E.g.*, *Stevens*, 935 F.2d at 1401-02. The fact that Wilke may have been investigated for running a prostitution ring – with no charges ever resulting – does not implicate the idea of "reverse 404(b) evidence" in this bankruptcy fraud case.

## C. The Court Properly Instructed the Jury

The Court properly denied defendant's request for a good faith jury instruction; it also properly included an instruction relating to aider and abettor liability.

Defendant has not identified *any* evidence to support her claim that a good faith instruction was warranted in this case. Indeed, there was none. Furthermore, the jury was instructed that, in order to find defendant guilty, it had to find, among other things, that:

14

she knowingly devised and participated in a scheme to defraud, and she did so with the intent to defraud. Tr. 6/17/16 at 974. Moreover, the jury was instructed in detail as to what the terms "knowingly" and "intent to defraud" mean. *Id.* at 975. Under these circumstances, the jury was adequately instructed on the law. *See*, *e.g.*, *United States v. Kokenis*, 662 F.3d 919, 929-31 (7th Cir. 2011) (no evidence supported defense theory of good faith; also, instructions on "willfulness" necessarily encompassed the theory of good faith); *United States v. Koster*, 163 F.3d 1008, 1011-12 (7th Cir. 1998) (jury instructed as to meaning of "intent to defraud" and "knowingly," so good faith instruction not needed).

Likewise, there was no error in the Court's giving Seventh Circuit Pattern Jury Instruction 5.06(a) regarding aiding and abetting. Tr. 6/17/16 at 976. The evidence, both testimonial and in the form of defendant's voluminous emails and other documents, made it indisputable that defendant had induced and procured the commission of bankruptcy fraud by Ekkehard Wilke.

## III.    CONCLUSION

For all the reasons set forth above, defendant's motion for judgment of acquittal or a new trial should be denied.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    /s/ Stephen L. Heinze
STEPHEN L. HEINZE
KENNETH E. YEADON
Assistant United States Attorneys

15

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUTTAL OR, IN THE ALTERNATIVE, A NEW TRIAL**

was served pursuant to the district court's ECF system as to ECF filers on August 30, 2016.

By:    /s/ Stephen L. Heinze
STEPHEN L. HEINZE
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-1265

16